# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL REYNOLDS : | CIVIL ACTION |
| *Plaintiff* : | |
| : | NO. 15-0016 |
| v. : | |
| : | |
| MUNICIPALITY OF NORRISTOWN, : | |
| *et al.* : | |
| *Defendants* : | |

NITZA I. QUIÑONES ALEJANDRO, J.　　　　　　　　　　　　　　　　MARCH 28, 2019

## SUPPLEMENTAL MEMORANDUM OPINION

**INTRODUCTION**

By Order dated December 28, 2016, this Court granted, *in part*, and denied, *in part*, the motion for summary judgment filed by the Municipality of Norristown, Officer Charles Douglass ("Officer Douglass"), Corporal Joseph Benson ("Corporal Benson"), Officer Lindsey Tornetta ("Officer Tornetta"), Sergeant Tims, Officer Brian Graham, and Sergeant Langdon. [ECF 69]. Specifically, the Order denied the motion for summary judgment with respect to the argument for qualified immunity made by Officer Douglass, Corporal Benson, Officer Tornetta, and Sergeant Tims (collectively, the "Individual Defendants"). [*Id.* at 4-5]. Thereafter, the Individual Defendants filed an interlocutory appeal. In its ruling, the United States Court of Appeals for the Third Circuit (the "Third Circuit") vacated the denial of the motion for summary judgment with respect to qualified immunity, and remanded this matter to this Court "to specify which material facts, if any, preclude qualified immunity as to (1) the false arrest claims against Corporal Benson and Officer Douglass, and (2) the inadequate medical treatment claims against Corporal Benson, Officer Douglass, Sergeant Tims, and Officer Tornetta, under the relevant standards for each claim."

Consistent with the Third Circuit's direction, this Supplemental Memorandum Opinion addresses the Individual Defendants' arguments with respect to qualified immunity. For the reasons stated herein, the motion for summary judgment on the basis of qualified immunity is granted, *in part*, and denied, *in part*.

## BACKGROUND

In his complaint, Plaintiff asserts claims for, *inter alia*, false arrest against Corporal Benson and Officer Douglass (Count I) and failure to provide adequate medical care against Corporal Benson, Officer Douglass, Sergeant Tims, and Officer Tornetta (Count IV). As is required at the summary judgment stage, this Court has considered all record evidence and supported relevant facts in this matter in the light most favorable to the non-moving party, *i.e.*, Plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The facts relevant to Plaintiff's claims and to the Individual Defendants' qualified immunity defenses are summarized as follows: [1]

> On January 13, 2013, at approximately 11:30 p.m., Plaintiff was pulled over by Norristown Police Department Officer Graham. Before pulling Plaintiff over, Officer Graham had followed Plaintiff briefly to see if he swerved or exhibited any other indicators of intoxication. Plaintiff drove appropriately, followed all traffic signals, and used turn signals. After he pulled Plaintiff over, he did not think that Plaintiff appeared impaired. Plaintiff was compliant, answered all questions, and did not slur, pause, or stutter when speaking. Further, there was no odor of alcohol or marijuana detected in the car. Video of the traffic stop also shows Plaintiff getting out of the driver's seat and walking around the car to the passenger side. It appears Plaintiff had no difficulty standing or walking. Ultimately, Officer Graham issued Plaintiff a citation for driving with a suspended license. Plaintiff's sister, Jennifer Kemp, picked up the vehicle and drove it home.

---

[1] The facts are taken from the parties' respective briefs and proffered statements of undisputed facts. To the extent facts are disputed, such disputes are noted and, if material, construed in Plaintiff's favor. Facts asserted by a party, supported by the record, which are uncontested, whether directly or by implication, by the other party, are taken to be true. *See* Fed. R. Civ. P. 56(c).

Shortly thereafter, on January 14, 2013, at approximately 12:34 a.m., Plaintiff was involved in a one-vehicle accident when he collided with an exterior wall of a residence at 800 West Lafayette Street in Norristown. Officer Douglass[2] and Corporal Benson[3] of the Norristown Police Department ("NPD") responded to the scene of the accident, and their interaction with Plaintiff was recorded on the NPD's DIVR system.[4] When Plaintiff was assisted out of the driver's seat of the vehicle, he was unsteady, had difficulty standing without assistance, was disoriented, and had difficulty responding to questions and commands. Officer Douglass and Corporal Benson observed Plaintiff staggering and unable to stand, and they noted their suspicion that he might be high on some drug or suffering from some medical condition. The following exchange between Corporal Benson, Officer Douglass and an EMT on the scene occurred:

> **Benson**: Call her back. Ask her if this guy is on any medication. He's all looped up. We don't know why and his car is wrecked. We're getting an ambulance down here to check him out . . . let's hopefully find some drugs in here. That way it can make this easy, just arrest his ass. I don't smell any booze on him . . . He does not smell like alcohol. I don't know if he's high. He ran into this. He's all loopy. He's staggering and I don't know what it is. I don't know if it's the accident or what but it does not look like it could have been caused by the accident.

\*\*\*

> **Benson**: His condition isn't indicative. He didn't hit his head or anything he's just, something's up with him.
>
> **EMT**: Ok.

---

[2] Officer Douglass is a patrolman with the Norristown Police Department with twenty years of experience. He completed the Montgomery County Police Academy in May of 1996. Douglass was the initial officer dispatched to Lafayette Street for a vehicle accident into a building and was the arresting officer. He was the first officer on the scene.

[3] Corporal Benson has been with the Norristown Police Department for twenty-one years, and a Corporal since 2008. He has a bachelor's degree from Penn State University, and he graduated from the Delaware County Police Academy in 1994.

[4] The parties provided the Court with video recordings of the initial traffic stop and the accident scene, which this Court has reviewed. In addition, in Plaintiff's Counterstatement of Material Facts, [ECF 41], Plaintiff provides a transcription of some of the dialogue recorded on the video at the scene of the accident. The Individual Defendants have not responded to or contested this transcription. For purposes of this Court's consideration of the Individual Defendants' underlying motion for summary judgment, this Court has accepted Plaintiff's transcription of the video.

**Benson**: Might be on something, but I can't smell no booze on him.

***

**Benson**: BB, go in there and search his pockets and see if we find any drugs on him, because this is weird.

***

**EMT**: He's like real slurred.

**Benson**: Oh he couldn't stand up. We had to stand him up. And he does not seem loaded but he just seems on something I just don't know what.

**EMT**: We are checking his sugar . . . he might be having . . .

**Benson**: Diabetic?

***

**EMT**: He's not letting me check him out.

**Benson**: He won't let you check his sugar?

**EMT**: No. He's not answering any of my questions.

**Benson**: Hey listen, if you don't let them check your sugar . . .

**Douglass**: You can either get arrested or go to the hospital.

**Benson**: You're gonna get arrested for DUI, you understand me? And then you're gonna go up there, and then we are gonna get blood drawn. Alright? They just want to make sure you're not having some sort of diabetic episode. That's all they're doing, is a sugar check. It has nothing to do with any kind of chemical testing to your blood or anything like that. Do your understand me? Fine.

**EMT**: (inaudible).

**Benson**: We're gonna arrest him.

**EMT**: Okay! You good?

**Benson**: Yep.

> **EMT**: Outstanding.

***

> **Douglass**: You had the chance to go to the hospital. You didn't want to do that, so now you go to jail.
>
> **Benson**: Come on.
>
> **Reynolds**: For how long?
>
> **Cop 3**: Couple months . . .
>
> **Benson**: Come on.
>
> **Douglass**: Yeah, til we decide.

Plaintiff denied having used any drugs or alcohol, and a search of Plaintiff and his car did not turn up any alcohol, drugs, or drug paraphernalia. As noted, Plaintiff did not receive any medical evaluation or treatment at the scene of the accident. Plaintiff contends that, due to his head injury, he was unable to communicate his medical history or consent to medical treatment.

After Plaintiff was transported to jail, Plaintiff's sister arrived at the scene of the accident and informed Corporal Benson that Plaintiff had high blood pressure and diabetes, did not do drugs, and did not drink. The following exchange occurred:

> **Benson**: Uh, we don't know what's going on with him. Does he have any kind of diabetic history or anything like that?
>
> **Ms. Kemp**: Yeah, diabetic and hypertension.
>
> **Benson**: Okay, so why wouldn't he just let the paramedics just take his sugar? If they would have taken him to the hospital, he would have been fine.
>
> **Ms. Kemp**: He needs to go the hospital. That's not like him.
>
> **Benson**: Let me, let me, let me . . . .
>
> **Ms. Kemp**: Noooo, I'm just saying. I'm just concerned. Yeah.

***

**Benson**: He hit the building on this side, he hit the building on this side. He hit something else over here, I don't know what he hit over there. Um, he was driving around earlier on a suspended license so they gave him a citation. So he . . . somehow he got the car back and he's driving around. He ran into this lady's building, she called. So we got here, he's being very difficult and he's staggering around a lot and I don't think it's from the accident, cuz this was a lot of cosmetic . . .

**Ms. Kemp**: Um hmm.

**Benson**: I have a feeling he's either on something or he's got some medical condition. He says he has none. He won't get . . . he won't let the medics take his sugar and he does not wanna give any kind of blood work, so there's not much else we can do except arrest him.

***

**Benson**: Does he have any kind of drug problem?

**Ms. Kemp**: No.

**Benson**: Ok.

**Ms. Kemp**: Nooo. That's why I'm surprised. He does not even drink! But he does have high blood pressure and diabetes, that's about it.

***

**Ms. Kemp**: Can I ask him to go to the hospital?

**Benson**: We already did. He's gone . . . .

**Ms. Kemp**: Oh, he's not in the car no more.

**Benson**: If he changes his mind, they'll come down. They'll check his sugar. If that's what's going on we'll find out but otherwise, you know, we're not pulling tiger's teeth here, we're just trying to get him . . . it's not like you're gonna get nothing from the sugar test except sugar . . . Alright . . .

After Corporal Benson and Officer Douglass arrested Plaintiff, he was transported by Officer Douglass to the Norristown Police Department's detention

facility, arriving at approximately 1:00 a.m. Video of Plaintiff's arrival at the detention facility, his processing, and approximately seven-hour detention were provided.[5] The video shows that upon arrival, Plaintiff continued to struggle to walk or stay upright on his feet, requiring the officers to drag him into the station.

Officer Douglass, Sergeant Tims,[6] and other officers carried Plaintiff into his jail cell, and threw or dropped him face down on a metal cot. Before these officers left the view of the jail cell camera, they observed Plaintiff fall off of the cot and onto the concrete floor. Neither Sergeant Tims, Officer Douglass, nor any other officer examined or assisted Plaintiff after he fell to the floor. Plaintiff essentially remained on the concrete floor of the jail cell for the next seven hours. During that time, Plaintiff can be observed struggling at times to pull himself off of the floor, only to fall back to the floor. Also during that time, officers can be seen walking past Plaintiff's cell, where he remained lying on the floor until 7:53 a.m. Notably, Sergeant Tims acknowledged that there are medical conditions that can cause similar symptoms to those exhibited by Plaintiff, such as a diabetic emergency and stroke.

At approximately 7:46 a.m., Sergeant Tims stood outside of Plaintiff's cell and observed Plaintiff unable to get off the floor. A minute later, another officer unlocked Plaintiff's cell and watched Plaintiff unable to get off the floor. At 7:53, Sergeant Tims, with other officers, attempted to get Plaintiff to his feet, but dropped him back onto the floor, where he became wedged between the metal bars and the metal cot. For the next two minutes, officers, including Sergeant Tims, stood and watched as Plaintiff was unable to stand or extricate himself. Eventually Sergeant Tims and others assisted Plaintiff out of his cell. A female officer, believed to be Officer Tornetta,[7] can be seen laughing as Plaintiff was removed from his cell.

---

[5] This Court has reviewed this video footage.

[6] Sergeant Tims is responsible for enforcing the Department's policies and procedures in the detention area. The cells in the detention area are viewed through three large TV screens that project from a computer with thirty different views. The cells are always kept on camera so that detainees can be monitored at all times. Sergeant Tims is notified when someone is arrested and is going to be placed in the cell area. He goes to the cell area to see if the officers need assistance or if there is an issue with anyone. If there is an issue, Sergeant Tims is notified immediately. If he is called to a scene in the detention area, he determines whether someone needs medical assistance and how often routine cell checks occur. However, if someone needs emergency medical assistance, anyone can make that determination. If someone needs individual monitoring, Sergeant Tims puts that person on a big screen and the rest of the cells on another screen.

[7] Officer Tornetta has been a Police Communications Officer ("PCO") since 2009. A PCO monitors prisoners in the cell block area on the various television monitors to make sure that they are not causing harm to themselves and are okay while in custody and determines how often routine checks occur. Officer Tornetta came on duty at 4:00 a.m. During cell checks, an officer physically walks to the

7

Plymouth EMS eventually arrived to evaluate Plaintiff for decreased loss of consciousness. Plaintiff was taken by the EMS to Mercy Suburban Hospital where he was found to be confused, disorientated, impulsive with extremely elevated blood pressure, and found to be suffering from an acute hemorrhage in the brain. Plaintiff was then transferred to Thomas Jefferson University Hospital for emergent treatment of a left basal ganglia intracranial hemorrhage. While en route, the EMS noted that Plaintiff was incapable of making any decision and of consenting or refusing any procedure.

**LEGAL STANDARD OF REVIEW**

Federal Rule of Civil Procedure ("Rule") 56 governs summary judgment motion practice. Fed. R. Civ. P. 56. Specifically, this rule provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Under Rule 56, the court must view the evidence in the light most favorable to the non-moving party. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).

Rule 56(c) provides that the movant bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record which the movant "believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden can be met by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* at 322.

---

cell area and views the prisoner through the cell bars. The PCO determines whether someone is unconscious or sleeping and notifies Sergeant Tims if someone is not breathing or gasping for breath.

After the moving party has met its initial burden, summary judgment is appropriate if the nonmoving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." *See* Rule 56(c)(1)(A)-(B). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party may not rely on "bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), nor rest on the allegations in the pleadings. *Celotex*, 477 U.S. at 324. Rather, the nonmoving party must "go beyond the pleadings" and either by affidavits, depositions, answers to interrogatories, or admissions on file, "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.*

## DISCUSSION

The Third Circuit remanded this matter for further analysis of the Individual Defendants' claim of qualified immunity with respect to Plaintiff's §1983 claims for false arrest and for failure to provide adequate medical treatment. The Individual Defendants argue that they are entitled to qualified immunity on these claims on the basis that Plaintiff has not established the requisite underlying constitutional violations. Plaintiff disagrees.

Section 1983 of Title 42 of the United States Code offers private citizens a means to redress violations of federal law by state officials. *See* 42 U.S.C. §1983. Section 1983 is not a source of substantive rights, but merely a method to vindicate violations of federal law committed by state actors. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). To establish a

claim under this section, the plaintiff must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law." *Id.* (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995)).

Satisfaction of these elements, however, does not guarantee recovery. Certain officials, including police officers and other state actors performing "discretionary functions," are shielded from suit if their conduct did not violate a "clearly established statutory or constitutional right[ ] of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014) ("An official sued under §1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct."); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). This doctrine, known as "qualified immunity," provides not only a defense to liability, but "immunity from suit." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Qualified immunity protects from suit "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

When a defendant in a §1983 action asserts a claim of qualified immunity, a court must first determine if the plaintiff's allegations are sufficient to establish the violation of a federal constitutional or statutory right. *Wilson*, 526 U.S. at 609; *see also Doe v. Delie*, 257 F.3d 309, 314 (3d Cir. 2001). "If the plaintiff's allegations meet this threshold, a court must next determine whether the right that the defendant's conduct allegedly violated was a clearly established one, about which a reasonable person would have known." *Delie*, 257 F.3d at 314–15. In doing so, the court must view the facts "in the light most favorable to the party asserting the injury." *Scott v. Harris*, 550 U.S. 372, 377 (2007).

Thus, in determining whether an officer is entitled to qualified immunity from suit, a court must answer two questions: "(1) whether the officer violated a constitutional right," and "(2) whether the right was clearly established, such that it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011) (internal quotations and modifications omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)). The questions may be answered in either order. *Pearson*, 555 U.S. at 242. The officer seeking to invoke qualified immunity bears the burden of showing its applicability. *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014) (citing *Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir. 2010)). Should the court choose to address the alleged constitutional violations, analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity. *See Gruenke v. Seip*, 225 F.3d 290, 299–300 (3d Cir. 2000); *Russoli v. Salisbury Twp.*, 126 F. Supp. 2d 821, 838–41 (E.D. Pa. 2000); *Crouse v. South Lebanon Twp.*, 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009).

This Court will separately consider Plaintiff's §1983 claims for false arrest and inadequate medical treatment under this applicable law.

### *Plaintiff's False Arrest Claims Against Corporal Benson and Officer Douglass*

Plaintiff asserts §1983 claims against Corporal Benson and Officer Douglass based on his contention of false arrest in violation of the Fourth Amendment. The Fourth Amendment protects against unreasonable seizures of the person. *See* U.S. Const. amend. IV. The Fourth Amendment is applicable to the States through the Fourteenth Amendment. *Baker v. McCollan*, 443 U.S. 137, 142 (1979). The proper inquiry in a §1983 claim based on false arrest is whether the arresting officer had probable cause to make the arrest. *Groman v. Township of Manalapan*,

47 F.3d 628, 634 (3d Cir. 1995) (quoting *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988)).

"Probable cause exists where the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a reasonable person to believe an offense had been committed." *United States v. McGlory*, 968 F.2d 309, 342 (3d Cir. 1992). In determining whether probable cause existed at the time of the arrest, the "arresting officer's state of mind (except for the facts that he knows)" and the charges "actually invoked by the arresting officer" are irrelevant. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). Instead, courts must objectively assess whether, at the time of the arrest and based upon the facts known to the officer, probable cause existed "as to any offense that could be charged under the circumstances." *Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005) (quoting *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994)). Courts must determine "whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964); *see also Devenpeck*, 543 U.S. at 152 ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.").

Crucially, "[t]he test for an arrest without probable cause is an objective one, based on 'the facts available to the officers at the moment of arrest.'" *Barna*, 42 F.3d at 819 (quoting *Beck*, 379 U.S. at 96). So long as the arresting officers "had some reasonable basis to believe" that the individual had committed a crime, "the arrest is justified as being based on probable

cause." *Id.* Courts must consider the totality of the circumstances known to the officer at the time of the arrest. *Andrews v. Scuilli*, 853 F.3d 690, 698, 704 (3d Cir. 2017).

Probable cause may exist "even in the absence of the actual observance of criminal conduct when a prudent observant would reasonably infer that a defendant acted illegally." *United States v. Burton*, 288 F.3d 91, 98 (3d Cir. 2002) (citing *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983) ("probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.")). In addition, "[t]he validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979). "[T]he kinds and degree of proof and the procedural requirements necessary for a conviction are not prerequisites to a valid arrest." *Id.*

With respect to the existence of probable cause to arrest Plaintiff, this Court finds that the undisputed evidence shows that the arresting officers had probable cause to arrest Plaintiff. Here, Corporal Benson and Officer Douglass discovered Plaintiff inside a parked, running vehicle with damage to its front and passenger side after it had run into the side of a house.[8] Plaintiff appeared disoriented, exhibited slurred speech, and had difficulty standing up. At the scene, Corporal Benson repeatedly noted that Plaintiff appeared "looped up" and suggested he thought Plaintiff was "high" and that he "might be on something." However, according to Corporal Benson, Plaintiff did not smell like alcohol, and Plaintiff had denied using either alcohol or drugs. The officers searched Plaintiff's car and person and found no evidence of alcohol or drug consumption. Both the paramedics and Officer Benson agreed that Plaintiff's symptoms could be diabetes-related and asked him if they could test his blood sugar levels.

---

[8] These officers were also made aware at the scene that Plaintiff had been pulled over by another officer approximately thirty minutes earlier and cited for driving with a suspended license.

When Plaintiff refused, he was arrested for driving under the influence, and was transported by Officer Douglass to the NPD headquarters. Officer Benson remained on the scene, where he was told by Plaintiff's sister that Plaintiff suffered from diabetes and hypertension and that he should be taken to the hospital. In response, Officer Benson stated: "I have a feeling he's either on something or he's got some medical condition. He says he has none. He won't let the medics take his sugar and doesn't want to give any kind of blood work, so there's not much else we can do except arrest him."

This Court finds that these facts, viewed in their totality and in a light most favorable to Plaintiff, are sufficient to meet the threshold of probable cause. Specifically, a reasonable and prudent officer in Corporal Benson and Officer Douglass' position would have believed that Plaintiff had committed an offense, *i.e.*, driving under the influence. As such, these two officers had probable cause to arrest Plaintiff, and there was no violation of Plaintiff's Fourth Amendment rights. Accordingly, Corporal Benson and Officer Douglass are entitled to qualified immunity with respect to Plaintiff's false arrest claims.

### *Plaintiff's Inadequate Medical Treatment Claims Against All Individual Defendants*

The Individual Defendants also invoke qualified immunity with respect to Plaintiff's claims for inadequate medical treatment.[9] In arguing qualified immunity as to this claim, the

---

[9] Because Plaintiff was a pre-trial detainee, and not a convicted prisoner, his denial of adequate medical care claim arises under the Fourteenth Amendment, rather than the Eight Amendment. *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003). However, the Supreme Court has held that the Fourteenth Amendment affords pre-trial detainees protections that are "at least as great" as those afforded to convicted prisoners under the Eighth Amendment. *Id.* (quoting *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983)). In the context of claims for inadequate medical care, the Third Circuit has held that "we have found no reason to apply a different standard than that set forth in *Estelle* (pertaining to prisoners' claims of inadequate medical care under the Eighth Amendment) when evaluating whether a claim for inadequate medical care by a pre-trial detainee is sufficient under the Fourteenth Amendment." *Id.* Therefore, Plaintiff's claim for denial of medical care will be analyzed using the framework of the Eighth Amendment even though he was a pre-trial detainee at the time of the

Individual Defendants argue in conclusory fashion that their conduct was not deliberately indifferent to Plaintiff's medical needs *solely* because Plaintiff refused medical care at the scene of the accident by medics summoned by Corporal Benson and Officer Douglass. (*See* ECF 36-2 at p. 31).[10] The Individual Defendants' argument is unpersuasive for several reasons. First, there is a genuine dispute of material fact as to whether Plaintiff refused treatment or was capable of making a competent decision with respect to his medical treatment at the scene of the accident.

---

alleged denial of care. *See id.* at 582 (evaluating pre-trial detainee's claim for inadequate medical care under same standard as claims brought under Eighth Amendment); *see also Miller v. Steele-Smith*, 713 F. App'x 74, 76 n.1 (3d Cir. 2017) (analyzing pre-trial detainee's inadequate medical care claim under Eighth Amendment framework).

The Eighth Amendment of the Constitution requires that prison officials "provide basic medical treatment to those whom [the State] has incarcerated." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97 (1976)). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Monmouth Cty Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (alteration in original) (quoting *Estelle*, 429 U.S. at 104)). To establish an inadequate medical care claim, Plaintiff must show: (1) a serious medical need; and (2) "acts or omissions" by prison officials demonstrating that they had a "deliberate indifference" to that need. *Estelle*, 429 U.S. at 106; *see also Natale*, 318 F.3d at 582. A medical need is deemed "serious," if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Lanzaro*, 834 F.2d at 347 (quoting *Pace v. Fauver*, 479 F. Supp. 456, 458 (D.N.J. 1979), *aff'd*, 649 F.2d 860 (3d Cir. 1981)). A medical need is also deemed "serious," if "unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care." *Id.* at 347 (citing *Estelle*, 429 U.S. at 105).

The second element of an inadequate medical care claim requires an inmate to show that prison officials acted with deliberate indifference to his serious medical need. *See Natale*, 318 F.3d at 582. Deliberate indifference is more than mere medical malpractice or negligence. *See Rouse*, 182 F.3d at 197. Rather, deliberate indifference has been likened to conduct that includes "recklessness or a conscious disregard of a serious risk." *Id.*; *see also Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017). More specifically, the Third Circuit has found deliberate indifference where a prison official: "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse*, 182 F.3d at 197 (citing *Durmer v. O'Carroll*, 991 F.2d 64, 88 (3d Cir. 1993)); *see also Lanzaro*, 834 F.2d at 346. Deliberate indifference requires the defendant to have been subjectively aware of the risk of harm to the inmate and to have consciously disregarded that risk. *Atkinson v. Taylor*, 316 F.3d 257, 262 (3d Cir. 2003) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

[10] Notably, the Individual Defendants do not make any argument with respect to the "clearly established" prong of the qualified immunity defense.

15

Though Corporal Benson and Officer Douglass requested EMS personnel at the scene of the accident, it is disputed whether the EMS personnel were permitted to fully evaluate Plaintiff or were effectively prevented by these two Defendants from doing so once Plaintiff purportedly refused a blood test.[11] Further, the recorded statements of Corporal Benson and Officer Douglass at the scene of the accident suggest that they suspected Plaintiff was suffering from some medical condition, possibly diabetes, which would require medical treatment. These suspicions were confirmed by Plaintiff's sister at the scene when she told Corporal Benson that Plaintiff suffered from both diabetes and high blood pressure, that Plaintiff did not drink alcohol or use drugs, and that Plaintiff likely needed medical care. Notwithstanding their own suspicions that Plaintiff might be suffering from some medical condition, a suspicion corroborated at the accident scene by Plaintiff's sister, Corporal Benson and Officer Douglass released the EMTs and did not thereafter obtain medical care or any medical evaluation for Plaintiff. It is also not clear that these two Defendants ever relayed their concerns about Plaintiff's health or the information provided by Plaintiff's sister to anyone at the detention facility

Further, Plaintiff's inadequate medical care claim is not premised solely on the Individual Defendants' failure to provide Plaintiff medical care at the scene of the accident or immediately following the accident. Rather, Plaintiff's claim is much broader and is also based on the Individual Defendants' failure to provide Plaintiff medical care at any time during the seven hours that he was left arguably semi-unconscious on the concrete floor of his jail cell. It is debatable whether reasonable officers in the Individual Defendants' positions would have recognized Plaintiff's need for medical care during this time period and that the Individual

---

[11] It is not clear from the video that Plaintiff refused any and all medical treatment, as the Individual Defendants suggest. At most, it appears Plaintiff refused a blood test. Moreover, Plaintiff has proffered evidence through his purported expert that Corporal Benson and Officer Douglass should have recognized at the accident scene that Plaintiff was incapable of consenting to or refusing medical treatment.

Defendants' failure to provide it would be a violation of Plaintiff's constitutional rights. This is particularly true in light of the fact that Officer Douglas and Corporal Benson suspected Plaintiff might be suffering from a medical condition at the scene of the accident, a suspicion confirmed by Plaintiff's sister. The Individual Defendants offer no argument in support of qualified immunity with respect to the time period when Plaintiff was seemingly ignored in his jail cell. Arguably, Sergeant Tims and Officer Tornetta observed Plaintiff for seven hours in his jail cell, all the while ignoring his struggle and inability to sit or stand up, only to decide at the end of that seven hours, while Plaintiff was exhibiting these same symptoms, that he needed immediate medical assistance.[12]

Notably, in support of qualified immunity, the Individual Defendants do not make any specific arguments with respect to the conduct of Sergeant Sims and Officer Tornetta at the police station. (*See* ECF 36-2 at pp. 30-32). To the contrary, the Individual Defendants rely solely on their contention that Plaintiff's purported refusal of medical treatment at the scene of the accident (which is subject to a genuine dispute of material fact) entitles all of the Individual Defendants to qualified immunity on this claim. (*Id.*). Because Plaintiff's purported refusal to accept medical treatment is the subject of a genuine dispute of material fact, this argument is misplaced. Moreover, any refusal to accept medical treatment at the accident scene does not immunize Sergeant Sims and Officer Tornetta for any deliberate indifference they exhibited over the next seven hours while Plaintiff laid on the concrete floor of his jail cell, arguably in a semi-unconscious state, and seen repeatedly struggling to get to his feet. A reasonable factfinder could view the seven-hour video of Plaintiff laying on the floor in his prison cell as showing an individual in serious need of medical assistance.

---

[12] As noted above, these two defendants held responsibility for monitoring the jail cells and determining whether any occupants required medical assistance.

17

Having viewed the video of Plaintiff's seven-hour detention, this Court finds that it arguably shows Plaintiff displaying weakness, difficulty speaking, confusion, an altered level of consciousness and an inability to stand or walk without assistance. It also shows officers carrying Plaintiff into a cell and dropping him face down on a metal cot, from which he almost immediately fell to the concrete floor. Over the next seven hours, Plaintiff can be seen at times struggling to pull himself up off of the floor, only to fall back down. He remained on the floor the entire time, while officers intermittently walked by his cell. When someone finally entered his cell at 8:00 a.m., a call for medical assistance was placed. Plaintiff was then removed from his cell and forced to stand against a wall while waiting for the EMS crew to arrive. He was held up by a police officer while a group of officers and personnel stood by, and laughed at and mocked him. Plaintiff was eventually transported to a hospital where he was diagnosed with an acute hemorrhage in the brain. This Court finds that these facts, viewed in the light most favorable to Plaintiff, could lead a reasonable factfinder to conclude that the Individual Defendants exhibited deliberate indifference to Plaintiff's medical needs. As such, the Individual Defendants' argument for qualified immunity as to this claim is denied.[13]

## CONCLUSION

For the reasons stated herein, Corporal Benson and Officer Douglass are both entitled to qualified immunity with respect to Plaintiff's claims for false arrest. However, disputed issues of material fact preclude a grant of summary judgment in favor of the Individual Defendants on the

---

[13] This Court notes that the Individual Defendants have not argued that the constitutional right or rights allegedly violated here were not clearly established at the time. Therefore, this Court has not addressed this prong of the qualified immunity analysis.

grounds of qualified immunity with respect to Plaintiff's claims for inadequate medical care. An Order consistent with this Supplemental Memorandum Opinion follows.

NITZA I. QUIÑONES ALEJANDRO, U.S.D.C. J.